**Opinion issued December 22, 2015**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-14-00764-CV

_____

**MAGNOLIA FINLAY & ANDREW FINLAY, Appellants**

**V.**

**ELIZABETH  BLANTON, Appellee**

---

**On Appeal from the County Civil Court at Law No. 1**
**Harris County, Texas**
**Trial Court Case No. 1047130**

---

## MEMORANDUM OPINION

This lawsuit involves a dispute between parties to a residential lease.  The

trial court entered a take-nothing judgment in landlord's favor on the tenants'

claim that landlord did not return the tenants' security deposit or provide an

accounting of deductions from deposit within 30 days of the tenants vacating the

premises. We reverse and render in part, and remand to the trial court for further proceedings.

## BACKGROUND

On March 28, 2012, plaintiffs-appellants Magnolia Finlay and Andrew Finlay entered into a one-year residential lease to rent a house on Hadrian Drive from defendant-appellee Elizabeth Blanton.

### A. Justice Court Proceedings

On May 5, 2014, the Finlays filed suit against Blanton in Justice Court alleging that they paid a $1,500 security deposit, and that Blanton "did not return the security deposit or made improper deductions to the security deposit." As damages, the Finlays sought the return of their deposit and, pursuant to section 92.109 of the Texas Property Code, $100.00 as a penalty, three times the wrongfully withheld $1,500.00 security deposit, and court costs.

Blanton filed an answer outlining the various ways that the Finlays allegedly failed to comply with their lease obligations and contending that she was actually owed $9,975 from the Finlays for late rent payment fees and other breaches. The correspondence attached revealed the crux of the parties' dispute in large part centered around the Finlays mailing their rent check to Blanton in California three times, instead of depositing the funds directly to Blanton's bank account.

On March 24, 2014, the Justice Court entered judgment in the Finlays' favor, awarding them $4,600.00 plus court costs. Blanton's motion for new trial was denied, with the court's handwritten notation that Blanton had violated her statutory duty to timely provide a written notice of deductions from the Finlays' security deposit, thereby forfeiting her right to retain the deposit. Blanton appealed to County Court.

**B.     County Court Proceedings**

In the County Court proceedings, Blanton pleaded the following affirmative defenses to the Finlay's section 92.109 claims: (1) "Plaintiffs' own acts or omissions proximately caused or contributed to Plaintiffs' injuries, if any," (2) "failure to mitigate damages," (3) "unclean hands," (4) "Defendant acted in good faith at all times in retaining Plaintiffs' security deposit for late charges in an amount in excess of the deposit resulting from Plaintiffs' intentional and willful failure to adhere to the terms of the Lease Agreement," and (5) "entitlement to credits and offsets to any damages."

On August 12, 2014, the County Court ordered that the Finlays take nothing against Blanton, and that Blanton take nothing against the Finlays. The Finlays appealed here. Blanton did not appeal the trial court's take-nothing judgment on her counterclaim.

# ISSUES ON APPEAL

The Finlays raise the following five issues in their appeal:

"ISSUE 1: Whether the trial court clearly abused its discretion misapplying Texas Property Code § 192.103 and 192.109, in a manner so arbitrary, subjective, unreasonable, or based on so gross and prejudicial an error of law under unfunded, untrue and inapplicable allegations to justify the landlord keeping the security deposit by:

    A. Allowing Blanton to calculate her 20-day vacation time, as 22–day late rent payment fees, on the basis that the check was in her mailbox, not deposited into her checking account, although rent payment was early, and the lease agreement states her physical address, as a second place of payment?

    B. Allowing Blanton to justify being an amateur landlord for failing to return the deposit and to furnish the required written itemization within 30 days after the property had been properly surrendered?

    C. Allowing Blanton to rebut bad faith without evidence presented to do so. Blanton did not suffer damages for not having the money deposited into her account at that particular time?"

"ISSUE 2: Whether the trial court failed to consider Plaintiff's claims regarding Defendant's violation of Tex. Prop. Code Ann. § 92.052?"

"ISSUE 3: Blanton committed perjury by lying in trial and forgery by altering the contract."

"ISSUE 4: Judicial Bias and Fraud. The trial court abused its discretion by excluding several Finlay's Exhibits, as hearsay, and by not allowing (discriminating) Mr. Finlay to object it because of his slow speech due to his health condition. The Court Reporter missing key evidence, and dialogues."

"ISSUE 5: Errors in the Lease Agreement and Breach of Contract Automatically Debunking Blanton's claims."

Blanton raises the following "response to appellants' issues presented":

1. "The trial court did not err in entering a take nothing judgment."

2. "The trial court did not err in excluding inadmissible evidence and testimony."

3. "Appellants did not raise the issues of untimely repairs, forgery, or errors in the lease in the trial court; therefore, these issues are improper on appeal."

## APPLICABLE LAW

The Texas Property Code provides that a landlord is generally obligated to refund a tenant's security deposit within 30 days of the tenant vacating the premises, with statutorily prescribed penalties for failure to do so:

### § 92.103. Obligation to Refund

(a) Except as provided by Section 92.107 [obligating tenant to provide forwarding address], the landlord shall refund a security deposit to the tenant on or before the 30th day after the date the tenant surrenders the premises.

(b) A requirement that a tenant give advance notice of surrender as a condition for refunding the security deposit is effective only if the requirement is underlined or is printed in conspicuous bold print in the lease.

(c) The tenant's claim to the security deposit takes priority over the claim of any creditor of the landlord, including a trustee in bankruptcy.

TEX. PROP. CODE ANN. § 92.103 (West 2014).

### § 92.104. Retention of Security Deposit; Accounting

(a) Before returning a security deposit, the landlord may deduct from the deposit damages and charges for which the tenant is legally liable under the lease or as a result of breaching the lease.

5

(b)     The landlord may not retain any portion of a security deposit to cover normal wear and tear.

(c)     If the landlord retains all or part of a security deposit under this section, the landlord shall give to the tenant the balance of the security deposit, if any, together with a written description and itemized list of all deductions. The landlord is not required to give the tenant a description and itemized list of deductions if:

(1)     the tenant owes rent when he surrenders possession of the premises; and

(2)     there is no controversy concerning the amount of rent owed.

TEX. PROP. CODE ANN. § 92.104 (West 2014).

## § 92.109. Liability of Landlord

(a)     A landlord who in bad faith retains a security deposit in violation of this subchapter is liable for an amount equal to the sum of $100, three times the portion of the deposit wrongfully withheld, and the tenant's reasonable attorney's fees in a suit to recover the deposit.

(b)     A landlord who in bad faith does not provide a written description and itemized list of damages and charges in violation of this subchapter:

(1)     forfeits the right to withhold any portion of the security deposit or to bring suit against the tenant for damages to the premises; and

(2)     is liable for the tenant's reasonable attorney's fees in a suit to recover the deposit.

(c)     In an action brought by a tenant under this subchapter, the landlord has the burden of proving that the retention of any portion of the security deposit was reasonable.

(d)     A landlord who fails either to return a security deposit or to provide a written description and itemization of deductions on

6

or before the 30th day after the date the tenant surrenders possession is presumed to have acted in bad faith.

TEX. PROP. CODE ANN. § 92.109 (West 2014).

"A tenant may establish a prima facie case of bad faith by showing that the landlord failed to refund the deposit within 30 days or that it failed to provide the itemized list of deductions within 30 days." *Hardy v. 11702 Memorial, Ltd*, 176 S.W.3d 266, 271 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (citing *Wilson v. O'Connor*, 555 S.W.2d 776, 780–81 (Tex. Civ. App.—Dallas 1977, writ dism'd)). Bad faith implies an intention to deprive the tenant of a lawfully due refund. *Id.* "To defeat the presumption, the landlord must prove his good faith, i.e., 'honesty in fact in the conduct or transaction concerned.'" *Id.* (citing *Wilson*, 176 S.W.2d at 780–81). Absent rebutting evidence, the presumption that the landlord acted in bad faith by failing to return the deposit or provide a written description and itemization of deductions within 30 days after surrender compels a finding of bad faith. *Id.*

## STANDARD OF REVIEW

Although couched in numerous subparts, the Finlays' first issue rests upon the two questions, i.e., (1) whether Blanton carried her burden of rebutting the presumption of bad faith in retaining the Finlays' security deposit without providing a timely accounting of deductions, and (2) whether the Blanton carried her burden of demonstrating that the retention of the Finlays security deposit was

7

reasonable.  By rendering a take-nothing judgment against the Finlays, the trial court implicitly found that Blanton rebutted the presumption of bad faith and that the Blanton proved that retention of the deposit was reasonable.  The Finlays argue that these findings are "against the great weight and preponderance of the evidence, and is clearly wrong and unjust."  Their prayer requests that we reverse and render judgment in their favor.  Interpreting this as a challenge to the legal and factual sufficiency of the evidence, we accordingly analyze whether the trial court's implied findings are supported under both standards.

When the trial court acts as a fact-finder, we review its findings under the legal and factual sufficiency standards.  *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000); *Vongontard v. Tippit*, 137 S.W.3d 109, 112 (Tex. App.—Houston [1st Dist.] 2004, no pet.).  When, as here, a party who does not have the burden of proof at trial challenges the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor and disregarding contrary evidence unless a reasonable fact-finder could not.  *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *City of Houston v. Hildebrandt*, 265 S.W.3d 22, 27 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (citing *Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998)). "If there is any evidence of probative force to support the finding, i.e., more than a mere scintilla, we will

8

overrule the issue." *Hildebrandt*, 265 S.W.3d at 27 (citing *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005)).

In reviewing a factual sufficiency challenge, we examine the entire record and consider and weigh all the evidence, both in support of, and contrary to, the challenged finding. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Vongontard*, 137 S.W.3d at 112. Having considered and weighed all the evidence, we should set aside the verdict only if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We cannot merely substitute our opinion for that of the trier of fact and determine that we would reach a different conclusion. *Hollander v. Capon*, 853 S.W.2d 723, 726 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

## EVIDENCE[1]

In addition to the admission of several trial exhibits, three witnesses testified at trial: (1) plaintiff Mrs. Finlay, (2) defendant Ms. Blanton, and (3) Blanton's attorney (as to his attorney's fees).

---

[1] "The Finlays filed an appendix to their brief containing exhibits that they acknowledge are not in the record, and they "pray that this Court consider th[is] sworn evidence." We do not, however, "consider documents attached to an appellate brief that do not appear in the record." *Till v. Thomas*, 10 S.W.3d 730, 733 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

9

## A.    The Lease

The parties' lease, which was introduced at trial, was executed on March 23, 2012 and provides a term from March 28, 2012 through March 30, 2013.  The lease provides that monthly rent of $1,500.00 will be paid "so that the Landlord receives the monthly rent on or before . . . the first day of each month during this lease."

Under "Place of Payment," there is a typed physical address listed for Blanton in San Diego, California, as well as bank name handwritten beside it, "USAA Federal Savings Bank," with routing and account number.[2]   Under "Method of Payment," there is a handwritten notation stating "see above," with an arrow pointing to the the previous section.

The "Late Charges" section of the lease provides that if "Landlord does not actually receive a rent payment in the full amount at the designated place of payment by the 1st day of each month at 11:59pm, Tenant will pay Landlord for each late payment (1) an initial late charge equal to . . . $50, and (2) additional late charges of $25 per day thereafter until rent and late charges are paid in full."

Section 10 of the lease sets forth terms related to the security deposit, and its payment and return:

---

[2]    There is email correspondence between the Finlays and Blanton's relator indicating that the handwritten bank account information was added after the lease was signed because Blanton wanted "to keep her banking information private until [she had] the deposit in hand."

10

**SECURITY DEPOSIT:**

A.  Security Deposit: On or before execution of this lease, Tenant will pay a security deposit to Landlord in the amount of $ 1.500.00. "Security deposit" has the meaning assigned to that term in §92.102, Property Code.

B.  Interest: No interest or income will be paid to Tenant on the security deposit. Landlord may place the security deposit in an interest-bearing or income-producing account and any interest or income earned will be paid to Landlord or Landlord's representative.

C.  Refund: Tenant must give Landlord at least thirty (30) days written notice of surrender before Landlord is obligated to refund or account for the security deposit.

Notices about Security Deposits:

(1) §92.108, Property Code provides that a tenant may not withhold payment of any portion of the last month's rent on grounds that the security deposit is security for unpaid rent.

(2) Bad Faith violations of §92.108 may subject a tenant to liability up to 3 times the rent wrongfully withheld and the landlord's reasonable attorney's fees.

(3) The Property Code does not obligate a landlord to return or account for the security deposit until the tenant surrenders the Property and gives the landlord a written statement of the tenant's forwarding address, after which the landlord has 30 days in which to account.

. . . .

D.  Deductions

(1) Landlord may deduct reasonable charges from the security deposit for:

(a) damages to the Property, excluding normal wear and tear, and all reasonable costs associated to repair the Property;

(b) costs for which Tenant is responsible to clean, deodorize, exterminate, and maintain the Property;

(c) unpaid or accelerated rent;

(d) unpaid late charges;

(e) unpaid utilities and utility expenses Landlord incurs to maintain utilities to the Property as required by this Lease;

(f) unpaid pet charges;

(g) replacing unreturned keys, garage door openers, security devices, or other components;

(h) the removal of unauthorized locks or fixtures installed by Tenant;

(i) Landlord's cost to access the Property if made inaccessible by Tenant;

(j) missing or burned-out light bulbs and fluorescent tubes (at the same location and of the same type and quality that are in the Property on the Commencement Date);

(k) packing, removing, and storing abandoned property;

(I) removing abandoned or illegally parked vehicles;

(m) costs of reletting (as defined in Paragraph 27), if Tenant is in default;

(n) attorney's fees, costs of court, costs of service, and other reasonable costs incurred in any legal proceeding against Tenant;

(o) mailing costs associated with sending notices to Tenant for any violations of this lease;

(p) any other unpaid charges or fees or other items for which Tenant is responsible under this lease; and

(q) cost to restore walls, flooring, landscaping or any alteration to the Property not approved in writing by Landlord.

(2)    If deductions exceed the security deposit, Tenant will pay to Landlord the excess within 10 days after Landlord makes written demand.

The lease contains a "Default" section providing that "If Landlord fails to comply with this lease, Tenant may seek any relief provided by law." The default section also grants permission to the Landlord to terminate the lease and accelerate unpaid rents, as well as seek damages for repairs and reletting. The Finlays moved

12

out on June 18, 2013, after Blanton gave them notice that they needed to pay accrued late payment fees or move out.

Six days before the Finlays moved out, they provided their forwarding address by email and requested their security deposit be returned. Twelve days after they moved out, they sent Blanton a certified letter again requesting return of their deposit. That letter cited section 92.109 of the Texas Property Code and informed Blanton that the Finlays would be seeking penalties under that section equivalent to three times the amount of the security deposit if they did not timely receive a return of their deposit or an itemized list of deductions Blanton was retaining. It is undisputed that Blanton did not return the Finlays' security deposit or provide an itemized accounting detailing reasons for withholding funds.

### B. Plaintiffs' Testimony

Mrs. Finlay testified that she and her husband insisted that there be a lease clause permitting deposits into a bank account rather than mailing a check. After Blanton provided information for an account with USAA, Mrs. Finlay requested that Blanton instead open an account with Houston branches, such as Bank of America.

Mrs. Finlay testified that she understood from the terms of the lease that they had agreed to pay the rent each month into Blanton's account at USAA Federal Savings Bank. She testified that the Finlays made their first month's rent payment

(April 2012) timely into the USAA account from their Bank of America account, but had to pay fees to Bank of America. The second and third months (May & June 2012), they mailed a check to Blanton's San Diego address, as they understood that to be an acceptable secondary method of payment under the lease.

In the meantime, the parties continued to correspond about bank accounts. The Finlays again requested that Blanton open a bank account with Bank of America so that they could make a local Houston deposit. Several email chains related to this issue were entered into evidence, in which the Finlays complained that they had trouble transferring money from Bank of America to Blanton's USAA account and again reiterating their unwillingness to incur bank transfer fees. The Finlays informed Blanton that if she was unwilling to come up with a solution, they would continue to mail their rent, rather than directly deposit it.

In June, 2012, Mrs. Finlay requested that Blanton open a Wells Fargo checking account to receive the Finlays' rent payments

The record contains a July 13, 2012 email from Blanton providing her Wells Fargo bank account number and stating that she would send a lease addendum stating that the Finlays can pay their rent into her Wells Fargo account on or before the 1st of each month beginning in August to "avoid late charges and default issues." Mrs. Finlay stated that the parties signed the addendum permitting the Finlays to use a Wells Fargo account as the designated payment location, although

14

there is not a copy in the trial court record. With the exception of October 2012, the Finlays' rent payments from August 2012 through June 2013 were made through deposit into Blanton's Wells Fargo account.

Mrs. Finlay testified that the Finlays paid the rent late one time—in February 2013— because "there was apparently a discrepancy between payments with — our bank." Although she arranged to pay the rent on time that month, it was received by Blanton three days late, so the Finlays "decided to pay the hundred-dollar late fee" for that incident. She did not believe that any other valid late charge was ever incurred under the lease.

## C.    Defendant's Testimony

Blanton testified that she is an amateur lessor who has never been a landlord before. When she bought the Hadrian Drive property in 2010, she was not aware of the Texas Property Code provision requiring that a detailed itemized deduction list be provided explaining deductions from a tenant's security deposit.

Blanton spends a lot of time out of the country, so when Mrs. Finlay told her that she would start mailing checks to Blanton's address if Blanton would not open a Bank of America account, Blanton gave the Finlays account information for an LLC bank account at Wells Fargo and sent them a lease addendum permitting rent to be paid at Wells Fargo. Blanton testified that the addendum was never returned to her signed by the Finlays, despite email reminders. Blanton testified that at one

15

time she began eviction proceedings, but abandoned them after realizing that would adversely impact the Finlays' credit score.

Blanton also testified that she regularly sent emails to the Finlays regarding the amounts that she believed they owed in late fees under the lease. Pursuant to the lease, Blanton applied the Finlays' payments first to late fees ($50 for first late day, and $25 for each day thereafter) and then to rent, such that the Finlays were never caught up. She calculated that, because of unpaid late fees, the Finlays owed $9,416.66 in unpaid rent when they moved out, calculated as follows:

| Month | Rent Due | Initial Late Fee | Other Late Fees (#days x $25) | Credits | Amount Paid | Balance Forward Owed | Payment Location |
|---|---|---|---|---|---|---|---|
| Apr. 2012 | $1,500 | $0 | $0 | $0 | $1,500 | $0 | Realtor |
| May 2012 | $1,500 | $0 | $0 | -$150 cleaning credit | $1,350 | $0 | USAA |
| June 2012 | $1,500 | $50 | 28x$25=$700 | | $1,500 | $750 | Mailed |
| July 2012 | $1,500 | $50 | 29x$25=$725 | | $1,500 | $1,525 | Mailed |
| Aug. 2012 | $1,500 | $50 | 29x$25=$725 | | $1,500 | $2,300 | Wells Fargo |
| Sept. 2012 | $1,500 | $50 | 28x$25=$700 | | $1,500 | $3,050 | Wells Fargo |
| Oct. 2012 | $1,500 | $50 | 29x$25=$725 | | $1,500 | $3,825 | Wells Fargo |
| Nov. 2012 | $1,500 | $50 | 28x$25=$700 | | $1,500 | $4,575 | Wells Fargo |
| Dec. 2012 | $1,500 | $50 | 29x$25=$725 | | $1,500 | $5,350 | Wells Fargo |
| Jan. 2013 | $1,500 | $50 | 29x$25=$725 | | $1,500 | $6,125 | Wells Fargo |

| | | | | | | |
|---|---|---|---|---|---|---|
| Feb. 2013 | $1,500 | $50 | 26x$25=$650 | -$100 late fee paid | $1,600 | $6,725 | Wells Fargo |
| Mar. 2013 | $1,500 | $50 | 29x$25=$725 | | $1,500 | $7,500 | Wells Fargo |
| Apr. 2013 | $1,500 | $50 | 28x$25=$700 | | $1,550 | $8,200 | Wells Fargo |
| May 2013 | $1,500 | $50 | 29x$25=$725 | | $1,550 | $8,925 | Wells Fargo |
| June 2013 | $1,500 | $50 | 19x$25=$475 | | $1,033.34 | $9,416.66 | Wells Fargo |

The monthly late fees stem from Blanton's position that the payments were not received at the "designated payment location" in June and July 2012. Then, for each subsequent month, Blanton applied rent checks first to the accrued late fees, resulting in additional late fees for the portions of the $1,500 payments that were not applied to rent.

The chart above was entered into evidence and Blanton testified that it "is a fair and accurate itemization." The calculations differ, however, from some of Blanton's email correspondence.[3]

---

[3] For example, on June 17, 2012, Blanton wrote an email to Mrs. Finlay indicating that she had June's rent in hand at least by June 17, 2012, and that she would not charge a late fee for June, but would on future mailed checks:

> I have been out of the country and per my instructions, the USPS held my mail during my absence. To my dismay, when I returned home I found your check in my on-hold mail instead of my USAA account for automatic payment of bills.
> Therefore, your June payment was late according to the Residential Lease (page 2, 5 A & C), which you signed. This is the last time I will allow a deviation.

Blanton testified that she was not claiming any deductions from the Finlays' security deposit for damages to the house, only for accrued late charges that resulted in unpaid rent because she applied each rent payment first to late charges. Blanton testified to her belief that she "gave fair notice to the Finlays during the course of the lease that they were incurring late charges" and that she did not act "purposely, willfully or intentionally to cause the Finlays harm" or to harass them in failing to provide an accounting of deductions from their security deposit.

Blanton's attorney also provided testimony that she incurred $5,057.96 in reasonable and necessary attorneys' fees.

## A.     Sufficiency of the Evidence

Blanton does not dispute that the bad-faith presumption in section 92.109 of

---

Late charges will apply from now on as stipulated in the Residential Lease.

In a July 21, 2012 email to the Finlays, Blanton states, with regard to the June and July 2012 rent checks mailed to her house, "I had every legal right to charge late fees for all the days your payment was not in my USAA account, but I chose to simply remind you of your signed agreement."

In July 2012, the Finlays gave notice to Blanton that they would be out of the country in October, so they would be mailing their rent to Blanton on October 1, 2012 rather than depositing it at Wells Fargo. On October 24, 2012, Blanton wrote Mrs. Finlay an email stating that she was out of town on the first of October and was charging the Finlays 23 days of late fees for October, because that is how long it took her to return home, receive the check, and put it in the bank.

The information in these emails is at odds with the chart entered into evidence, which indicates Blanton assessed the Finlays late charges for 29 and 30 days in June and July, and that October 2012 rent was deposited in Wells Fargo (rather than received in the mail), and assessed a 30-day late fee.

the Texas Property Code applies here. But she argues that the trial court properly found that she rebutted the presumption of bad faith in retaining the Finlays' security deposit and failing to provide an accounting because (1) "she had reason to believe she was entitled to retain [the] security deposit to recover reasonable damages," (2) she "is an amateur lessor—because the residence is her only rental property—and the landlord has no knowledge of the requirement to submit an itemized list of deductions," and (3) she believed she "gave fair notice to the Finlays during the course of the lease that they were incurring late charges." She also contends that, because the Finlays "owed over nine thousand dollars in back rent and late fees," the retention of their security deposit was reasonable.

### 1. Reasonableness of Retention of Security Deposit

A landlord has the statutory burden to prove that retention of a tenant's security deposit was reasonable. TEX. PROP. CODE ANN. § 92.109(c) ("In an action brought by a tenant under this subchapter, the landlord has the burden of proving that the retention of any portion of the security deposit was reasonable.); *Pulley v. Milberger*, 198 S.W.3d 418, 431 (Tex. App.—Dallas 2006, pet. denied) ("As it relates to the [tenants'] claims for bad faith failure to return the security deposit under section 92.109(a), which seeks, in part, to recover their security deposit, we will address the issue as a challenge to the trial court's implied finding of fact that [the landlord's] retention of the security deposit was reasonable under section

19

92.109(c)").

Deductions from a security deposit are reasonable for items the tenant is legally liable for under the lease or by statute. *Hardy*, 176 S.W.3d at 273–75 (Tex. App.—Houston [1st Dist.] 2004, no pet.). In this case, Blanton concedes that the entire basis of her withholding the Finlays' security deposit is the Finlays mailing the rent to her California address rather than depositing in her bank account for months two and three of the lease term. Blanton did not testify that these payments arrived late, but rather that she was out of the country when they were mailed and thus was unable to deposit them until her return. Given that the California address is listed as one of the places of payment permitted in the parties' lease, we conclude that there no evidence to support the trial court's implied finding that Blanton's retention of the Finlays' deposit based on their mailing the rent payments rather than directly depositing them was reasonable. *Hardy*, 176 S.W.3d at 275 ("We conclude that there is no more than a scintilla of evidence that landlord was entitled to any of the deductions taken from the security deposit" because the "deductions were attempts to recover for items the tenant was not legally liable for under the lease or Property Code"). Accordingly, we reverse the portion of the trial court's take-nothing judgment that denies recovery of Finlays' security deposit, and render judgment that the Finlays recover their $1,500 security deposit from Blanton.

## 2.  Bad Faith

"A landlord who fails either to return a security deposit or to provide a written description and itemization of deductions on or before the 30th day after the date the tenant surrenders possession is presumed to have acted in bad faith." TEX. PROP. CODE ANN. § 92.109(d) (West 2014).  Evidence that a landlord failed to refund the deposit within 30 days or that it failed to provide the itemized list of deductions within 30 days makes out a prima facie case of bad faith.  *Hardy*, 176 S.W.3d at 271 (citing *Wilson*, 555 S.W.2d 780–81).  Bad faith implies an intention to deprive the tenant of a lawfully due refund.  *Id*. at 271.  "To defeat the presumption, the landlord must prove his good faith, i.e., 'honesty in fact in the conduct or transaction concerned.'"  *Id*. (citing *Wilson*, 176 S.W.2d at 780–81).  Absent rebutting evidence, the presumption that the landlord acted in bad faith by failing to return the deposit or provide a written description and itemization of deductions within 30 days after surrender compels a finding of bad faith.  *Id*.

Blanton contends that her evidence rebutted the bad faith presumption that she retained the Finlays' deposit in bad faith.  She testified that she is an "amateur lessor" and that she had been "[m]ore than accommodating" to the Finlays during the course of their lease.  Specifically, she tried to help them work out how to pay rent to her USAA account and then allowed them to deposit money into her Wells Fargo account.  She started, and then stopped, proceedings to evict the Finlays

21

because she read "where it could adversely affect their credit score and [she] didn't want to do that." She testified that she had no "ill-will or malice towards the Finlays" and that she believed that it was the Finlays that broke the lease by mailing two rent checks. She believed that because the "payments were not received to the designated payment location," the Finlays incurred late fees that snowballed as she deemed every additional rent payment to be late and short, as it went first to paying initial late fees. Finally, although she acknowledged that she did not account for her retention of Finlays' security deposit within 30 days of their moving out, she testified to her belief that she "gave fair notice to the Finlays during the course of the lease that they were incurring late charges." She stated she never acted purposefully to cause the Finlays harm or harass them.

The Finlays point out that, although Blanton testified that she was an amateur landlord and cites, in her appellee's brief, her testimony that she "had no knowledge of the requirement that you needed to submit an itemized list of deductions," there is evidence that she was aware of the statutory requirement at the relevant times and simply chose not to comply with it. She testified that "*when she bought the property* and became a landlord" (emphasis added), she was not "aware of this statute in the Texas Property Code that required you to send an itemized deduction 30 days after." However, the lease Blanton entered with the Finlays states "The Property Code does not obligate a landlord to return or account

22

for the security deposit until the tenant surrenders the Property and gives the landlord a written statement of the tenant's forwarding address, *after which the landlord has 30 days in which to account*." (emphasis added).

Blanton acknowledged that she received a certified letter from the Finlays within 30 days of them moving out—i.e., during the window that she still had time to comply with the requirement that she return the deposit or provide an accounting—specifically citing section 92.109, and putting her on notice that the Finlays would seek the statutory treble damages if she did not comply. When asked why, after receiving that letter, she did not provide the Finlays an accounting, Blanton responded "Because everything I sent [the Finlays], they ignored." She also stated that she did not comply because the Finlays "owed [her] much more than the deposit."

The parties agree that, because of an issue with a bank transfer, the Finlays' February 2013 rent was received by Blanton three days late. The Finlays accordingly paid a $100 late fee pursuant to the lease ($50 for the first day, and $25 for subsequent days). The entire basis for Blanton's calculation that the Finlays owed over $9,000—thereby justifying her belief that she was entitled to retain the Finlays' deposit—was based upon rent in June and July 2012 being sent physically to her California address, which is a designated "Place of Payment" under the lease. Because of those two mailed payments—which were in

compliance with the lease terms (despite both parties preferring electronic bank transfers)—Blanton assessed late charges for *every* single day for 13 months.

Contrary to Blanton's representation to the Finlays in an email that she would not charge them late fees for mailing the rent checks in June and July of 2012, she assessed late fees for *every* day of both months (despite having received the rent),  which set off a chain of daily late charges for remainder of the Finlays' tenancy.

We have already concluded that, under the terms of the parties' lease, the trial court erred in finding that Blanton's retention of the Finlays' security deposit was reasonable.  Given the conflicting evidence on bad faith, we remand the Finlays' claim for statutory damages for bad faith retention of the security deposit for additional proceedings in light of our holding that the deposit was wrongfully withheld.

We sustain the Finlays' first issue in part and overrule it in part.

### ADMISSION OF EXHIBITS AND TESTIMONY

In their fourth issue, the Finlays complain that the court excluded several exhibits as hearsay.  These exhibits include copies of payment receipts, bank account statements, receipts for repairs, letters from Wells Fargo, screen shots of bank transactions, United State post office certified mail delivery receipts, and correspondence with the court reporter about the record.  There was a discussion of

these exhibits off the record, and then the court resumed with: "We are now back on the record.  I am admitting Plaintiffs' Exhibits A, B, H, I, and J.  And I am sustaining the hearsay objection to C, D, E, F, G."

The trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard.  *In re E.A.K.*, 192 S.W.3d 133, 140 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).   A trial court abuses its discretion when it rules without regard for any guiding rules or principles. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). We must uphold a trial court's evidentiary ruling if there is any legitimate basis for the ruling.  *Id*. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004).

Here, there is no record of the hearing to discuss whether this evidence should be admitted.   The Finlays provide no argument or authority for their assertion that the trial court's exclusion of these documents was an abuse of discretion, nor do they claim that they presented to the trial court an exception to the hearsay rule for any of these exhibits.  In light of this, we will not hold that the

25

trial court abuse its discretion in excluding these exhibits.

Relatedly, the Finlays claim that the trial court improperly limited Mr. Finlay's objections and testimony. Specifically, they complain about the trial court admonishing Mr. Finlay that he could not speak from the gallery of the courtroom during his wife's testimony (while she was on the stand) to answer a question that was posed to her. They also complain that the court would not let Mr. Finlay testify through "objections" while others were on the stand. Finally, they argue that, while Mr. Finlay was cross-examining Blanton, the trial court improperly limited his questions. Again the Finlays do articulate how the trial court allegedly erred, nor how they were harmed. And again they cite no authority in support of their argument. We will not hold that the trial court acted outside its discretion by disallowing side-bar testimony or limiting Mr. Finlay's cross-examination time.

We overrule the Finlays' fourth issue.

### ISSUES RAISED FOR THE FIRST TIME ON APPEAL

In their second, third, and fifth issues, the Finlays raise arguments that were not raised in trial court. Specifically they complain that Blanton did not make timely repairs, Blanton made false statements at trial, Blanton submitted different late fee calculations in the Justice Court than in the County Court, and that Blanton committed forgery by adding an email address to the lease after the Finlays moved out. We overrule the Finlays' second, third, and fifth issues, as we do not consider

26

such issues raised for the first time on appeal. *E.g.*, *Wells Fargo Bank, N.A. v. Leath*, 425 S.W.3d 525, 540 (Tex. App.—Dallas 2014, pet. denied) (holding claim not raised in the trial court was waived, absent authority that would allow party to raise issue for the first time on appeal); *Haden v. David J. Sacks, P.C.*, 332 S.W.3d 503, 520 n.13 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("We may not address this contention because it was never presented to the trial court."); *In re Marriage of Lendman*, 170 S.W.3d 894, 898 (Tex. App.—Texarkana 2005, no pet.) ("It is improper to present a new issue on appeal.").

## CONCLUSION

We reverse the trial court's take-nothing judgment as the Finlays' claim for return of their security deposit and render judgment that the Finlays recover their $1,500 deposit. We reverse and remand the remainder of the trial court's judgment for further proceedings.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.